## Case No. 17,712.

WILLIAMS et al. v. The ADOLPHE.

[19 Am. Jur. 219.]

District Court, D. Rhode Island. Aug. Term, 1837.

SALVAGE—DERELICT—INTENT TO ABANDON—COMPENSATION.

1. Property found in a vessel, abandoned in a harbor on an uninhabited coast, comes within the maritime definitions of derelict property, unless it appears that there was an intention to return to the vessel, on the part of the officers and crew.

2. When a part of the cargo of a vessel is thrown overboard to make room for property found abandoned, the owners, of such part of the cargo are not entitled to be first reimbursed out of the proceeds of the substituted property, but as between the salvors, in adjusting their proportions, their claim should be duly considered, and should be taken into the general account of the merits and sacrifices of the salvors.

[This was a libel for salvage by Caleb Williams, Jr., and others against the cargo, tackle, and apparel of the ship Adolphe.]

PITMAN, District Judge. This is a cause of salvage originally instituted by the master and owners of the bark Triton for themselves alone. Afterwards their libel was so amended by consent as to include the crew of the Triton, excepting Ephraim Hansen, Duncan McClellan and Joseph M. Smith. A petition and claim for salvage was at the same time filed by the said Hansen, McClellan and Smith, which was resisted by the master and owners, on grounds stated in their answer; but at the hearing, the answer to this petition was abandoned and the libel agreed to be amended so as to include all the crew of the Triton, as libellants. I have been thus relieved from the consideration of any material question of controversy as between the salvors. A claim has been interposed by the consul-general of France residing at New York, in behalf of the original owners of the ship Adolphe and cargo. being French subjects, praying for restitution after awarding to the libellants competent salvage.

The material facts stated in the libel, and supported by the proof, are: The Triton on a voyage from New York to the Pacific Ocean and the northwest coast of America, on the 18th of February last, and between the 47th and 48th degrees of south latitude, encountered a severe gale of wind and shipped a sea, which caused so much damage that the projected voyage was abandoned. and she put away for the harbor of St. Elena. on the east coast of Patagonia. to repair. On the 22d February she reached the harbor of St. Elena, and found there stranded the French ship

Adolphe, of Nantz. At low water she was high and dry upon the rocks. She appeared to be a French whale ship, with some cargo on board, being part of her outfit, and abandoned by her officers and crew; she had a large hole in her bottom. so that the tide flowed in and out of her; her rudder was carried away, her keel sprung on one side, a considerable proportion of the copper washed off, and she was hogged or broken-backed. She was in a condition which rendered it apparently impossible to get her off from the rocks, and if so, to make her fit for sea. After surveying the wreck, the master, and Hunt, the supercargo and part owner of the Triton, thought it best to attempt saving the cargo of the Adolphe, her tackle and apparel; and, to make room on board the Triton for the same, they deemed it necessary and did throw overboard a part of the Triton's cargo, which they thought less valuable than what they expected to save from the Adolphe. The Triton lay in the harbor of St. Elena from the 22d of said February until the 18th of March last, her crew employed in saving the cargo and apparel of the Adolphe, and in repairing the damages sustained by the Triton. The latter was the work of two or three days by such of the crew as were employed therein, the residue being employed in the salvage service. Having got out all the cargo which they could, the Adolphe was set on fire by the orders of the master of the Triton, to get the copper and copper bolts which could not be procured without. In about two days, after the ship was partly burned, a gale came on, accompanied with a higher tide than they had before experienced, which in the opinion of some of the witnesses, would have washed away the Adolphe and what remained in her, if she had not been set on fire, and which actually washed away what was remaining, and removed many articles of great weight, which had been deposited on the shore, supposed to be in a place of safety.

The libellants claim salvage on property derelict, and the owners of the cargo of the Triton (being the same as the owners of the ship) claim to be remunerated for that portion which was thrown overboard, aside from their other claims as salvors. It is contended in behalf, of the owners of the salved property that this is not a case of derelict, that the officers and crew of the Adolphe abandoned her with the intention of returning (as is to be presumed) when they had obtained the means so as to be able to save the cargo, and that the service rendered by the salvors merits not the high reward usually given in cases of derelict. And, whether a case of derelict or not, it is contended that the claim for remuneration for the cargo thrown overboard is wholly unprecedented in relation to the owners of the salved property, however it may be considered in adjusting the proportions of salvage among the respective salvors.

Whether this be a case of derelict or not may not be very material, except as bringing the case within a rule which has been adopted in the admiralty courts in this country, as a guide to judicial discretion. Apart from this rule, the meritorious nature of the services rendered, and the small amount of property saved, might induce the court to decree an amount of salvage as great as if guided by the rule in cases of derelict. If the property is found abandoned by the officers and crew, it comes within the maritime definition of derelict, unless it appears there was an intention to return to the vessel. Was there any evidence of such an intention in this case? Those presumptions which may arise in cases of ships found on shore or stranded in a civilized and inhabited country do not exist in this case. The Adolphe was found on an uninhabited coast, and, as far as she might be visited on the land side, it was by savages. The circumstances in which the Adolphe was found furnished no presumption that the crew intended to return. On board, the hatches were gone, the companion-way open; on shore they found chests and tents, but the provisions and clothes strewed about the tents, and no appearances of any care to preserve the property until they might return to take it, either on board or on shore. I deem it unnecessary to pursue these remarks, as those who set up the intention of returning in cases of abandonment, prima facie, are bound to give some evidence of this intention. A paper found on board the Adolphe signed by Hyppolitus Leopold Saxemoeder, harpooner on board the Adolphe, dated February 8, 1837, is relied on to show the intention of returning. He was the owner of a chest found on board, and this paper appears to have been written for the purpose of preserving his claim for the space of three years. In this paper he says (speaking of the chest), "It is not abandoned. We pray those who shall find it to respect it for the space of three years," &c. A paper signed by a person of so little consequence on board would not be entitled to much consideration, as evidence of the intention of the master to return to the vessel. But it proves too much, if anything,—an intention not to abandon under three years. It will hardly be contended that the Adolphe and cargo were not to be deemed derelict until after that time. If the owner of this chest deemed it necessary in order to preserve his property to leave this paper, why did not the master of the Adolphe leave some writing, which might show what was his intention in leaving her. and giving some directions to those who might take possession of the property? There was a paper found in a bottle at the head of the grave of one of the crew of the Adolphe. drowned during the shipwreck. This paper gave an account of the disaster and the name of the deceased, and was formally signed by officers and crew; but nothing was in it which told of any intention of returning. nor whither the master

and crew had gone. I consider, therefore, the claim of the libellants in this case to be for salvage on property derelict.

The question occurs, what proportion of the property saved ought to be awarded to the salvors? Here it is necessary to consider a preliminary question which has been made by the claimant, as tending to diminish the amount of salvage, or as forfeiting all right to the same. It has been said the firing the Adolphe was a wanton destruction of property; that a portion of her cargo was thus destroyed, and if the master and crew of the Adolphe had returned, they were thereby prevented from saving that part of the cargo which the Triton did not take; and that such an act deserves the severe rebuke of a court of admiralty, whose duty it is to guard against the destruction of property. I have looked into the evidence in this case with much attention to see if there was any foundation for these suggestions,—feeling it my duty to visit a wanton destruction of property, where there was any hope of recovery with such a diminution or forfeiture of salvage, in relation to the guilty, as private rights and public justice might require. I see nothing in the evidence, however, which warrants these imputations upon the salvors or any of them. On the contrary they appear to have acted in a manner which would have been approved by the owners of the Adolphe, had they been present. The sacrifice of the less to the greater was the part of prudence and propriety. The object of the salvors was to obtain all they could from the wreck, and in so doing they acted for the benefit of the owners as well as themselves. It has been suggested that the hogsheads on board the Adolphe, when found, might have contained whale oil. There is nothing in the evidence to lead to such a presumption,—there were no appearances that the Adolphe had taken any whales; if there had been oil on board when the ship was on fire, it would have been manifested in all probability by the raging of the flames, but no one then entertained such a suspicion. The master of the Triton says they found no oil on board, except olive oil in bottles. Beverly, one of the crew of the Triton, says, "We got all out of the Adolphe but the ground tier of hogsheads, which were full of salt water." Hart, another of the crew, says, "We left in the lower tier of hogsheads in the wreck; the water flowed in so that we did not dare to work there, and the wreck was falling to pieces every day we lay there." Hunt, the supercargo, says they saved everything they could save. Smith, the mate, whose testimony was taken and introduced by the claimant, says, "After we got out most of the oil casks the captain and Hunt concluded to burn her." He says, "Two-thirds of the second tier in the lower hold of the Adolphe was broken up." He says, indeed, "We left the oil casks on board, because the captain and Mr. Hunt were afraid of a noise or a mutiny on board the ship, and thinking the copper was worth more

than the casks." The testimony of the sailing-master, Hansen, introduced also by the claimant, is, that they "saved all the cargo they could; that they left some oil-casks, some were full of salt water, some empty, and some bilged in the lower hold; that the lower deck beams broke down and rested on some of these casks, so that they could not get them out without staving them; that they had to stave a number of bread casks to get the bread, on this account, and that, in his opinion and that of the crew, the captain and Mr. Hunt, it was best to set the vessel on fire; that there was no appearance of any whales having been taken by the Adolphe from anything on board; and that he considered the wreck, after some of the goods were got out, in a very dangerous situation on account of the heavy blows." No evidence in contradiction of this is in the cause. That more copper was not procured by the burning of the ship was not the fault of the salvors; she was set on fire on the 10th of March, according to the testimony of Captain Williams, and the Triton remained at St. Elena until the 18th of the same month. The master says, "We got a small proportion of the copper by setting the wreck on fire, and should probably have got the major part of it, had it not been for the gale on the 11th and 12th, which swept it into the sea."

I come now to the consideration of the question whether the owners of the Triton and cargo are to be paid specifically for that part of the cargo of the Triton which was thrown overboard to make room for the property saved from the Adolphe. In the case of Small v. Goods Saved from The Messenger [Case No. 12,961], the cargo of the brig which saved the goods was displaced to receive them. There was in this case no claim to salvage by the owners of the cargo thus displaced. They probably held the master and owners of the brig liable to them, but nothing is said by the court, giving to the owners of the brig any further claim on this account, and Judge Peters seemed to be relieved from all difficulty in this respect, as there was no claim on this account by the owners of the cargo. In the case of The Harmony, decided in the New York district court, reported in 1 Pet. [26 U. S.] 34, note, the salving ship threw overboard her cargo, stated in the libel of the value of five thousand dollars, to make room for the cargo salved. The amount of property saved was large, and a moiety of the net amount, after paying all expenses and costs, was decreed to the salvors, one-third part of which was given to the owners of the salving ship, but no allowance was made, eo nomine, for the cargo thrown overboard. In that case, the master and mate of the salving vessel were owners of the vessel, and received also an allowance as salvors, in their capacity of master and mate. I do not find any case, in which the claim by the owners of the cargo thrown overboard, was set up, as in this case. As between the salvors, in adjusting their proportions it ought undoubtedly to be duly considered, and also

to be taken into the general account of the merits and sacrifices of the salvors, but not as constituting by itself a distinct claim, entitled first of all to be paid. In this case, the claim of the owners for a full indemnity for the cargo thrown overboard amounts, as they have stated their account, to the sum of three thousand two hundred and ten dollars and eighty-three cents. The proceeds of the property saved, deducting duties, amounts to five thousand eight hundred and thirty dollars and fifteen cents, and the claim on this account alone is more than is usually allowed salvors in cases of derelict. What then would remain for the owners of the Adolphe, and what for the other salvors? It would seem, indeed, from the statement at the hearing, as if the owners of the Triton could not be remunerated for the loss of the voyage they might have made after repairing damages at St. Elena, if they had carried the salt which was thrown overboard to Monte Video, and brought home from thence a cargo of hides, as was contemplated at one time. Why was not this done? There was undoubtedly a mistake as to the value of the Adolphe's cargo, but the consequences of this mistake are not so to be visited on the owners of the Adolphe, as to leave them nothing of the property salved. The claim of the libellants is for salvage, the services rendered were salvage services, and the owners are to receive their property again, after paying salvage for the services rendered them. What service would it be to them to take their property under circumstances calling for the whole of it by way of indemnity? The mistake of the captain and supercargo, and part owner of the Triton, as to the value of the property on board the Adolphe, should not operate to the injury of the owners thereof; the salvors must bear the consequences of their own mistake, taking such a proportion only of the property salved, as by the law of the admiralty should be awarded them.

It has been urged for the claimant, for the purpose of diminishing the amount of salvage, that the Triton was enabled to make her repairs from the materials and tools found on board the Adolphe, and that without these the Triton could not have so repaired her damages as to have got home. If this were so, about which there is some contrariety of evidence, it was for the benefit of the owners of the Adolphe, that the Triton should have been repaired, otherwise their property could not have been saved by her means, and it does not lessen the merits of the salvage services, for which compensation is now to be decreed, because the salvage could not have been effected, but for the materials and aid furnished the salving ship from the wreck. In the case of The Ewbank [Case No. 6,376], the crew of the Hope, one of the salving vessels, when she fell in with the Ewbank, were suffering for want of provisions, and were greatly relieved by obtaining a supply from the Ewbank. This seems to have been urged in that case as diminishing the claims of

those salvors who were on board the Hope. On this point Mr. Justice Story said: "Nor do I think the distressed state of the Hope, at the time when she fell in with the Ewbank, can make any substantial difference in her merit. at least not in respect to her co-salvors. She might have supplied her necessities, and been excused and perhaps justified in so doing, from the abundance of the floating derelict ship, and then have left the latter to her fate. She did not stop there; but, having supplied herself, undertook the not less grateful though perilous task of saving the residue for others."

I now come to the principal question in this cause,—the merits of the salvage services. The time employed by the salvors in loading the cargo of the Adolphe on board the Triton, was a little more than three weeks. They worked for several nights as well as days. During this time the Triton was exposed to several gales, and almost every night to heavy squalls, and much labor was required on board the Triton to save her from sharing the fate of the Adolphe. "Almost every night," says the master, "we were obliged to let go an extra anchor, and from fifty to eighty fathoms of chain cable, on account of heavy tornadoes coming out of the south and west almost every night, suddenly, without any previous notice." The mate, Smith, states. "We had frequently to let go two anchors almost every night, as the wind went around the compass almost every day, and blew so heavy at night, we were afraid of getting a round turn round our anchor." The frequent shifting of the winds rendered it necessary to heave up the extra anchors every day, to prevent the round turn mentioned by the mate. "Although the French ship lay in a very dangerous and rough place, and very much exposed to heavy seas that came into the harbor, it was," says the master, "perfectly safe to land with our boats on the west side of reef point, under the protection or lee of the land, without danger of life, either on the rocks or on the beach." The principal danger incurred during the salvage, was the exposure of the Triton to the same fate as the Adolphe, and it appears, from the fate of one of the crew of the Adolphe, that there was some danger of life in this exposure.

The cargo of the Adolphe was brought a long way hither: this was not necessary for the benefit of the owners of the Adolphe; it might have been saved, and in all probability placed in the hands of the master of the Adolphe in going into Buenos Ayres or Monte Video; and bringing it hither, therefore, though justifiable as the home of the saving ship, and if, as stated by Hunt, the supercargo, they thought this "the only place where they could dispose of the cargo from the wreck to any advantage," founds no extra claim for salvage on account of the length of the voyage hither.

The value of the Triton and her remaining cargo, at risk, whilst she lay in St. Elena, is not particularly proved. It was stated at the bar, that she was insured for six thousand dollars, and her cargo for ten thousand

dollars, on time, so that here there was no deviation, but the premium was probably enhanced from the nature of the insurance. The rule of salvage, in cases of derelict, ranges from a third to one half of the property saved, after deducting costs and expenses. Mr. Justice Story, in the case of Rowe v. The Brig [Case No. 12,093], after reviewing the law on this subject, comes to the conclusion, "that the general sense of the maritime world seems to be, that the rate of salvage, on derelicts, should not, in ordinary cases, range below a third, nor above a moiety of the value of the property, and that a moiety was the favorite proportion" of judicial tribunals. And in the same case he says, "that where a particular proportion has been frequently applied in a class of cases, slight or even considerable distinctions in the circumstances ought not to induce a court of law to depart from that proportion; that it was better to adhere to a rule which may operate somewhat unequally than to leave everything afloat in mere undirected discretion." The rule, however, he considers sufficiently flexible to admit of exceptions "in cases of extraordinary peril and difficulty, and exalted virtue and patriotism, where a moiety of even a very valuable property might be too small a proportion, or in cases of so little difficulty and peril, as to entitle the parties to little more than a quantum meruit for work and labor." The same learned judge had occasion to review this branch of the law in a subsequent case of The Emulous [Id. 4,480], in which he says: "The court may say, and indeed it has said, that generally, in cases of derelict, it will not allow more than one-half the value as salvage. But extraordinary cases of great danger and gallantry may occur in which the court would even desert this rule." And in the same case he adds: "On the other hand, the value of the property saved must always form a very important ingredient, since that proportion would be a very inadequate compensation in cases of small value; which would be truly liberal in others of great value." In a subsequent case, The Ewbank [supra], the same judge said: "The court on all occasions has great reluctance in deviating from a moiety, and expects a very strong case to be made out, in which, upon other principles, there would be a very great disproportion between the services and the compensation; so great indeed as in a moral and legal view to constrain the court to deviate from it." In this case he further said: "I agree that the value of the property saved constitutes a material ingredient in decreeing salvage." In the case of The Cora, decided in the circuit court for the Pennsylvania district [Case No. 1,621], Mr. Justice Washington remarked: "Where the usual proportion of the property saved would afford a very inadequate reward to the owners of the property at risk or to the salvors, this might afford a good reason for increasing the proportion of salvage with a view to such compensation, but without at the same time losing sight of the owners of the property saved." In the case of The Adventure, decided in the supreme court of the United States, 8 Cranch [12 U. S.] 228, Mr. Justice Washington, in delivering the opinion of the court, observed: "It being determined to be a case of salvage, the next question is as to the amount to be allowed. On this subject there is no precise rule, nor is it in its nature reducible to rule. For it must, in every case, depend upon peculiar circumstances, such as peril incurred, labor sustained, value decreed, &c., all of which must be estimated and weighed by the court that awards the salvage. As far as our inquiries extend, when a proportion of the thing saved, a half has been the maximum; below this it is usual to adjudge a compensation in numero. In some cases indeed more than a half may have been awarded; but they will be found to be cases of very extraordinary merit, or on articles of very small amount." In the case of The Jonge Bastiaan, 5 C. Rob. Adm. 323, reported as a case of derelict. Sir William Scott awarded for salvage, two-thirds of the whole property, which had been appraised and delivered on bail at three thousand four hundred pounds sterling. The time employed by the salvors in that case was somewhat more than the time which the salvors were employed in this case, looking only to the services at St. Elena, but not so much, if the voyage from St. Elena home be reckoned a part of the salvage services.

The services rendered in this case in the harbor of St. Elena were laborious, but not particularly perilous, except the dangers which threatened the Triton which have been stated, but which were guarded against by means of the cables and anchors of both vessels, though with much vigilance and labor. The services do not appear to me to be those of extraordinary peril and gallantry, sufficient to extract it from the general rule in cases of derelict, if the property saved had been of that value which would have afforded that liberal compensation, which it is the policy of the admiralty law to allow for salvage. I regret that it is not in my power to give this compensation to the salvors in this case, "without" (in the words of Mr. Justice Washington already quoted) "losing sight of the owners of the property saved." This I have no right to do. The salvors had no right to place the owners of this property in a predicament which would subject them to the loss of all their property in expenses, costs, and salvage. Something should remain to the owners of the property saved, as well as something given to those who volunteered their services in saving it. The expenses attending the unloading, storage, sale, and delivery of the property are heavy, exclusive of the marshal's fees, and, with the duties, consume nearly one-fourth of the gross amount of sales. The gross amount of sales is $6.-

797.84; the duties amount to $737.69; and the expenses above mentioned to $586.58. The rule of a moiety in cases of derelict is a moiety of the net amount, deducting expenses, costs, &c. Considering, however, the small amount of property saved, compared with the labor and services rendered, I have felt constrained to exceed the maximum usually allowed in cases of derelict, so far as to allow three-fifths, after deducting the duties. being a little more than a moiety of the gross amount. The expenses and costs. except those which have accrued by the litigation between the salvors, will be a charge upon the two-fifths remaining.

The general rule of distribution between the salvors, is to allow the owners of the saving ship and cargo one-third of the salvage. This was the rule recognised by Mr. Justice Story in The Ewbank, but which he admits should not be so inflexible as not to yield to extraordinary merits. or perils, or losses on the part of the owners. In The Ewbank, one-third was allowed the owners; in that case the judge observed, "Neither of these has suffered any loss or injury, in tackle, apparel. keel, or cargo," &c. In this case, the owners of the Triton lost that part of her cargo which was thrown overboard, and which, if it had arrived safe at this port. would have been worth as much as one-half of the salvage allowed. To allow them, however, a full indemnity for property lost, expenses incurred, and property at risk, would deprive the officers and crew of salvage. by whose labors it was principally procured. Under these circumstances, I allow the owners of the Triton and cargo a moiety of the salvage. In apportioning the residue between the officers and crew, I am instructed by the case of The Ewbank, that the general rule, under ordinary circumstances, has been to allow the master double the proportion of the mate. I perceive nothing in the circumstances of this case to induce me to depart from this rule. The character of Hansen, who appears as sailing-master in the shipping paper. is somewhat anomalous. In the deposition of the master he is called nominal sailing-master. and from his own deposition it appears that he wished to ship as second mate, but was put down as sailing master to prevent his being under the command of the mate, and that extra wages were allowed him from his expected services as pilot, when they arrived on the northwest coast of America, and especially in Columbia river. In the distribution. I allow Hansen somewhat less than the mate, and a little more than the second mate. To Lord and McClellan. though shipping for high wages, I have allowed but a seaman's share, as their high wages had reference not to their superior services on board ship, but as fishermen and net-makers, in which capacity they were of little or no use in the navigation of the vessel. but whose labors were probably worth those of the other men, in getting out,

and loading on board the Triton, the cargo of the Adolphe. The one moiety of the salvage allowed the officers and crew. I divide into fifty-three shares, to be distributed as follows: To Caleb Williams, Jr. master, ten shares; Stephen Hunt, supercargo, who was active in getting out the cargo, and commanded the men on board the Adolphe. nine shares; Joseph M. Smith, mate, five shares; Ephriam Hansen. four shares; David W. Wyman, second mate, three shares; Arthur Rayner, two shares; Nelson Crocker, two shares; George Fulton, two shares; Loyalist Mains, two shares; John B. Lord, two shares; Duncan McClellan. two shares; Dexter Taylor, one and a half shares; William Hart, one and a half shares; William Beverly, one and a half shares; William Jackson, one and three-fourths shares; William Angell, one and one-fourth shares; Daniel Adams, one and one-fourth shares; and to Frank (the servant and apprentice of Captain Williams), for his own use and benefit. one and one-fourth shares. Whatever costs may have accrued from the incipient litigation between the salvors are to be a charge on the portion awarded the salvors. All other costs and expenses, except the duties which have been provided for, are to be paid from the two-fifths remaining for the owners of the Adolphe and cargo; the residue is to remain in the registry of this court subject to the further order thereof, for the use and benefit of such person or persons as may in this court make title thereto as owner or owners of the ship Adolphe and cargo, or such person or persons as may be legally authorized by them to receive the same. I shall refer it to the clerk of this court, to ascertain and report the amount of salvage due to each party as above stated, and the decree will be drawn up accordingly.